UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

Living Water Fire Protection, LLC,                                    Case No. 21-30616

      Debtor.

Karin A. Garvin,

      Plaintiff,

v.                                                                                    Adversary Case No. 23-3008

West Coast WinSupply, Inc.,

      Defendant.

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL</u>

      The chapter 7 debtor in this case – Living Water Fire Protection, LLC ("Living Water") – was a subcontractor that installed commercial fire protection systems. Defendant West Coast Winsupply, Inc. sold the debtor materials such as sprinkler heads and pipes that were used in those installations. When the defendant learned that the debtor was going out of business, it stepped up its collections efforts. It ultimately received a little over $129,000 owed on seven jobs in Florida and Alabama from general contractors and property owners during the ninety days before the bankruptcy petition. The chapter 7 trustee has sued to recover those payments as preferences under Bankruptcy Code § 547, contending that the defendant's claims were unsecured and thus it received more than it otherwise would have in the chapter 7 bankruptcy. But the defendant had special rights as a material supplier under both Florida and Alabama law, and the court finds – with one exception – that because of those rights the defendant did not receive more than it would have in chapter 7.

1

The court held a bench trial on August 1, 2025 on the claims brought by the plaintiff-trustee Karin A. Garvin ("the trustee" or "pl.") as chapter 7 trustee for Living Water's bankruptcy estate seeking to avoid seven alleged preferential transfers under Bankruptcy Code § 547(b) to defendant West Coast Winsupply, Inc. ("Winsupply" or "def."). The court heard sworn testimony from Lorenzo Evans, Karin Garvin, Peter Joseph Cimino, Erin Faulkner (appearing by video by agreement of the parties), Angelina Lim, and R. Michael DeLoach. The court admitted the trustee's exhibits 1-17 and 23-33 and Winspply's exhibits 4C and 4F without objection, and Winsupply's exhibits 4A, 4B, 4D, and 4E over the trustee's objection.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(F), and the parties agreed to the entry of a final judgment by this court. (*See* Joint Report, doc. 21, at ¶1). For the reasons discussed below, the court finds in Winsupply's favor on all transfers but one.

<u>Findings of Fact</u>

<u>The relationship between Winsupply and the debtor</u>

From 2018 to 2021, Winsupply sold materials such as sprinkler heads and pipes to Living Water for its use as a subcontractor that provided fire protection construction services to general contractors and property owners, including the government, on construction projects in Northwest Florida and Alabama. (*See* Joint Statement of Undisputed Facts, doc. 87, at ¶3; Evans Test., Tr., at 36:1-24).[1] In other words, Living Water installed sprinkler systems for buildings such as schools, hospitals, commercial buildings, and houses. (*See* Evans Test., Tr., at 36:1-7).

In January 2018, Living Water signed a credit application in favor of Winsupply, providing that billing terms are as set forth in the sales invoices for all purchases under Living

---

[1] The court will refer to this as the "J.S.," to the Trial Transcript (doc. 127) as "Tr.," and to Testimony as "Test." throughout.

Water's account with Winsupply.  (*See* J.S., at ¶2; Pl.'s ex. 1).  Winsupply's invoices state payment is due 'Net 30' (30 days of the invoice date), but Living Water's payments to Winsupply routinely exceeded 30 days.  (*See* J.S., at  ¶¶ 4-5; Pl.'s ex. 2).  Living Water generally paid by check, and often paid one check for several invoices.  (*See, e.g.*, Cimino Test., Tr., at 70:4-8; Pl.'s exs. 30-33).

On May 24, 2021, Winsupply was informed that another company, Total Fire Protection, was going to take over Living Water's operations.  (*See* J.S., at ¶6; Pl.'s ex. 3).  As of that date, Living Water was late in its payments to Winsupply and owed $173,050.58.  (*See* J.S., at ¶¶7-9; Pl.'s ex. 4).  Winsupply almost immediately began recording claims of lien against some of the construction projects for which Living Water was a subcontractor and for which Winsupply had unpaid invoices and/or notifying the general contractors and property owners that it had unpaid invoices.  (*See* J.S., at ¶8; Pl.'s ex. 7-14; Faulkner Test., Tr., at 75:12-76:19).  Winsupply had not recorded any other claims of lien on projects it worked on with Living Water before then.  (*See* Cimino Test., Tr., at 70:11-16; *see also* Evans Test., Tr., 37:22-38:23; Pl.'s ex. 7).

Winsupply collected payments due from general contractors and/or property owners on multiple projects, primarily by way of a direct payment to Winsupply or, in some cases, a general contractor's joint check to Winsupply and Living Water.  (*See* J.S., at ¶10; *see also id.*, at ¶8).  It collected almost $160,000 in less than two months.  (*See* Faulkner Test., Tr., at 93:3-4; J.S., at ¶13; Pl.'s exs. 4-5, 8-14).

Living Water ultimately filed for chapter 7 bankruptcy in September 2021 and Ms. Garvin was appointed trustee.  Around that same time, Living Water's former office manager

absconded with most of Living Water's records on suspicion of embezzlement.[2] (*See* Evans

Test., Tr., at 44:2-17, 52:5-21, 60:1-16).


The alleged preferential payments

At issue in this action are seven accounts receivable payments totaling $129,079.93 from

general contractors or owners on seven projects ("the projects") in Alabama and Florida: five

private construction jobs and two government jobs. (*See* J.S., at ¶11; Pl.'s ex. 6; Cimino Test.,

Tr., at 123:8-19, 125:6-11, 127:21-24). All the payments were made within 90 days of Living

Water's bankruptcy filing.

The project names, locations, and methods of payment for the seven payments are as

follows:

- Alabama projects

  - South Baldwin (private job): $14,187.13 by joint check from the general
    contractor to Living Water and Winsupply that was endorsed by Living Water.
  - Trojan (private job): $15,608.40 direct payment from the general contractor.
  - Trojan/Ulta (private job): $6,435.70 by joint check from the general contractor to
    Living Water and Winsupply that was endorsed by Living Water.

- Florida projects

  - Seasound (private job): $16,158.91 direct payment from the general contractor.
  - Town Center (private job): $27,437.11 direct payment from the owner.
  - Watercraft (government job): $38,810.90 by joint check from the general
    contractor to Living Water and Winsupply that was endorsed by Living Water.
  - Tyndall (government job): $10,441.78 direct payment from the general contractor.

(*See* J.S., at ¶11; Pl.'s exs. 6, 8-14). Trojan and Trojan/Ulta were the same general location (a

---

[2] Because of this the court allowed Winsupply attorney Angelina Lim to testify about documents
– specifically two contracts (Def.'s exhibits 4B and 4D) – that she received in response to
subpoena, as the trustee's attorney would not stipulate to their admission. Those two contracts,
and one other that was admitted through witness Lorenzo Evans (Def.'s exhibit 4A) do not relate
to any of the seven construction projects at issue in this action.

shopping center), but two payments were received from two contractors.  (*See, e.g.*, Faulkner

Test., Tr., at 90:19-23; Cimino Test., Tr., at 126:3-9; Pl.'s exs. 10-11, 15).

      Winsupply also recorded claims of lien on two of the Florida projects.  It recorded a

claim of lien related to the Seasound project on or about May 28, 2021 and related to the Town

Center project on or about June 22, 2021.  (*See* Pl.'s exs. 7-8, 13, 15).

Winsupply's general practices

      Former Winsupply accounts receivable employee Erin Faulkner, who was with the

company from August 2019 to December 2024, testified about what Winsupply did when a job

starts:

> A. So a customer calls.  We create the – we obtain a credit application, verify
> their information from the credit app process as far as a limit, set a – a limit to
> their account.  And moving forward, we ask for job detail information.  So that
>
> way, we can input it in our system and notice – send notice to owners for the
> projects that we have obtained information.
>
> Q: Notice owners?  Okay.  So you always – do you send – do you always send
> notice to owners or notice to general contractors for every delivery that you make
> to a customer?
>
> A: That is obtained material for a project, yes.
>
> Q: Okay.  Is this an outside service you use, or is this a service that you do
> internally?
>
> A: It is an outside third party.
>
> Q: I see.  So you just provide the details of where you left the project, the general
> contractor or the owner, and it's automatically generated for each site work, right?
> Site drop?
>
> A: Correct.

(Faulkner Test., Tr., at 98:10-99:6; *see also id.*, at 74:9-13).

Peter Cimino, Winsupply's president at all relevant times, confirmed that it utilized a third party, National Association of Credit Managers, to send notices to owners and general contractors on Winsupply's behalf on both private and government jobs. (*See* Cimino Test., Tr., at 116:14-119:21, 123:8-128:5, 132:7-133:23). He explained that notice was given on all of the Alabama and Florida projects that are the subject of this action, and that such notices are always done "immediately once the job has been given" or "within a few days." (*See id.*, at 132:7-133:7).

Conclusions of Law

The court will first address issues about Winsupply's expert, Michael DeLoach, and will then address the trustee's preference claims.

### Mr. DeLoach

The trustee objected to Mr. DeLoach's testimony and the admission of his expert report (Def.'s exhibit 1). The court took the admissibility of the report under submission. The court will not admit the report because it has not relied on any testimony of the expert or any part of the expert report in reaching its conclusions.

### Preferences under Bankruptcy Code § 547(b)

Under Code § 547(b),

the trustee may . . . avoid any transfer of an interest of the debtor in property –
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such
    transfer was made;
(3) made while the debtor was insolvent;

(4) made . . . on or within 90 days before the date of the filing of the [bankruptcy] . . . ; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Under Code § 547(c)'s "ordinary course of business defense,"

the trustee may not avoid . . . a transfer . . .

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—

    (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

    (B) made according to ordinary business terms . . . .

The parties stipulated that the elements of § 547 are met except for (1) whether the transfers were "of an interest of the debtor in property," *i.e.*, whether the money paid to Winsupply by the general contractors and/or owners would have been property of the estate; (2) whether Winsupply received more than it would have under § 547(b)(5), *i.e.*, the liquidation analysis; and (3) whether the transfers were made in the ordinary course of business or according to ordinary business terms, *i.e.*, the ordinary course defense. The court will start with the liquidation analysis and then move on to the parties' arguments about property of the estate and the ordinary course defense.

(1) Liquidation analysis

The trustee's analysis showed that if the seven payments "came back to the estate, approximately $129,000, and Winsupply had an unsecured claim for that amount, that [Winsupply] would have received approximately $40,000." (*See* Garvin Test., Tr., at 64:11-21).

She argues that this is dispositive because unsecured creditors in Living Water's bankruptcy are not receiving a 100% distribution.  Her argument in essence is that she should have received any payments owed the debtor Living Water from the general contractors and/or owners and then distributed those payments on a *pro rata* basis to the unsecured creditors.

The chapter 7 trustee has only the rights of the debtor in property of the estate.  "A chapter 7 trustee 'stands in the shoes' of a debtor with respect to the debtor's interest in assets which become part of the estate."  *In re Romagnoli*, 631 B.R. 807, 814 (Bankr. S.D. Fla. 2021) (citation omitted).  "An 'elementary rule of bankruptcy is that the bankruptcy trustee succeeds only to the title and rights in the property that the debtor possessed.'"  *See In re Raborn*, 470 F.3d 1319, 1323 (11th Cir. 2006) (citation, brackets, and ellipses omitted).  "[T]he Bankruptcy Code is not intended to expand the debtor's rights against others more than they exist at the commencement of the case.  The trustee c[an] take no greater rights than the debtor [it]self had."  *See In re Witko*, 374 F.3d 1040, 1042-43 (11th Cir. 2004) (citations, brackets, and ellipses omitted).  In other words, the trustee acquires only those interests which the debtor would have had in an asset.  *See In re Romagnoli*, 631 B.R. at 814-15.  While "federal law determines whether an interest is property of the bankruptcy estate, . . . property interests are created and defined by state law.  [T]here is no reason why such interest should be analyzed differently simply because an interested party is in bankruptcy."  *See In re Witko*, 374 F.3d at 1043 (citation, quotation marks, and brackets omitted).

Winsupply was not a "traditional" general unsecured creditor under the applicable Alabama and Florida state law that the parties agree apply to the projects.  *See, e.g.*, *In re Apex Road Com., LLC*, No. 8:19-BK-03648-RCT, 2022 WL 2093358, at *5 (Bankr. M.D. Fla. June 3, 2022) ("'The § 547(b)(5) test is automatically satisfied whenever a *general* unsecured creditor

. . . receives any payment within the preference period unless the estate is sufficient to pay unsecured claims in full.'") (citation omitted) (emphasis added).  Under that law, as detailed below, the evidence shows that Winsupply had more rights than a general unsecured creditor for all but one of the projects and the trustee had no greater rights than Living Water would have had vis-à-vis that creditor.  The trustee would have had to pay Winsupply what it was owed from the accounts receivable and cannot show that Winsupply would have received more than it would have received under § 547(b)(5) except on the Tyndall project.  Winsupply is entitled to judgment in its favor on all claims but the trustee's claim related to the Tyndall project.

(a)  The Alabama projects (South Baldwin, Trojan, Trojan/Ulta)

Alabama Code § 35-11-210 provides for two types of materialman's liens: a lien against the property itself for the full price of materials furnished (a "full price" lien) and a more limited lien against the unpaid balance due to a contractor by an owner (an "unpaid balance" lien).  *See Valley Joist, Inc. v. CVS Corp.*, 954 So. 2d 1115, 1117 (Ala. Civ. App. 2006).  It is only this "unpaid balance" lien that is at issue.

The payments to Winsupply on the Alabama projects all came from general contractors. Alabama Code § 35-11-210 created a lien in favor of Winsupply as materialman against the general contractors to the extent of "the amount of any unpaid balance due the contractor by the owner . . . ."  *See Buckner v. Alpha Lumber & Supply Co.*, 628 So. 2d 450, 452 (Ala. 1993). These unpaid balance liens came "into existence immediately" when Winsupply furnished materials.  *See Greene v. Thompson*, 554 So. 2d 376, 379 (Ala. 1989); *see also generally In re Neylon*, 18 B.R. 765 (Bankr. S.D. Ala. 1982).  No advance notice is required.[3]  *See Bailey Mortg. Co. v. Gobble-Fite Lumber Co.*, 565 So. 2d 138, 141-42 (Ala. 1990); *Teague Hardware*

---

[3] The trustee confuses Alabama's unpaid balance lien (no advance notice required) with a full price lien (advance notice required).

*Co. v. Bankhead Dev. Co.*, 151 So. 2d 611, 612 (Ala. 1963).  Alabama courts have rejected the trustee's argument that Alabama Code § 35-11-210 does not apply because Winsupply provided materials to a subcontractor (Living Water), not to the general contractors.  *See, e.g.*, *Crane Co. v. Sheraton Apartments*, 58 So. 2d 614, 615-17 (Ala. 1952); *see also* A GUIDE TO MECHANICS' LIENS IN ALABAMA, 61 Ala. Law. 202 (2000) ("Generally speaking, . . . a material supplier to a prime contractor *or a subcontractor* has the right to file an 'unpaid balance' mechanic's lien [under Alabama Code § 35-11-210].") (emphasis added).

Creation (which occurs automatically) and perfection of an unpaid balance lien are separate issues.  For perfection,

> a materialman must: (1) provide written notice of the claimed lien to the owner; (2) file a verified statement of lien in the probate court in the county where the subject real property is located; and (3) file suit to enforce the lien and obtain a money judgment against the materialman's direct debtor.

*Valley Joist*, 954 So. 2d at 1117.  The materialman must (1) give notice under Alabama Code § 35-11-218.  *See Gobble-Fite*, 565 So. 2d at 142.  "With this notice, 'the owner then can take appropriate action in the disbursement of remaining contract monies to the general contractor to ensure that the potential lienors are satisfied and the property is not encumbered.'"  *See id.* (citation omitted).  After notice, the materialman must (2) file the verified statement "within four months" of the final furnishing of materials, which courts have determined by looking to the materialman's last invoice date.  *See* Ala. Code § 35-11-215; *Gobble-Fite*, 565 So. 2d at 143; *Government St. Lumber Co. v. Baldwin Cnty. Sav. & Loan Ass'n*, 532 So. 2d 645, 646-47 (Ala. 1988).  And (3), the materialman must sue to enforce the lien "within six months after the maturity of the entire indebtedness secured thereby . . . ."  *See* Ala. Code § 35-11-221; *Gobble-Fite*, 565 So. 2d at 143.  "More than likely, this will be . . . the date materials were last furnished."  *See Gobble-Fite*, 565 So. 2d at 143.

Winsupply's last invoices to Living Water on the Alabama projects are dated March
(Trojan and Trojan/Ulta) and May (South Baldwin) 2021.  (*See* Pl.'s ex. 4).  The issue of notice
is discussed in further detail below but, with respect to the Alabama projects, even if notice was
not given at the beginning of Winsupply's involvement, Winsupply still could have enforced its
"unpaid balance" lien by providing notice, filing a verified statement within four months (until
July and September 2021 respectively),[4] and then filing suit within six months.  Winsupply could
have done so after the bankruptcy filing, if timely, and the trustee would have had no recourse.
*See* 11 U.S.C. §§ 362(b)(3) and 546(b); *see also generally In re Cook*, 384 B.R. 282 (Bankr.
N.D. Ala. 2008); *Matter of Peek Constr. Co., Inc.*, 80 B.R. 226 (Bankr. N.D. Ala. 1986).

Of course, Winsupply ultimately did not have to perfect its unpaid balance liens because
the general contractors on the Alabama projects paid Winsupply in June and early July 2021 in
exchange for a release of its lien rights.  (*See* Pl.'s exs. 10, 11, 12, 15).  But the trustee has not
shown that Winsupply received more than it would have had those general contractors paid the
funds to her.  In other words, if the general contractors had paid the trustee, the trustee – standing
in the shoes of the debtor Living Water – would still have had to pay the materialman
Winsupply.  *See, e.g.*, *In re Johnson Mem'l Hosp., Inc.*, 470 B.R. 119, 125 (Bankr. D. Conn.
2012) (payment to holder of mechanic's lien during the preference period not avoidable where,
when payment was made, the lienholder "remained eligible to perfect the lien pursuant to
relevant State law, and . . . such perfection would not otherwise have been avoidable under the
Bankruptcy Code") (citation and quotation marks omitted); *see also In re BFN Operations LLC*,
604 B.R. 268, 275 (Bankr. N.D. Tex. 2019) (discussing the majority view that "[i]f the creditor

---

[4] The 90-day analysis on pages 9 and 10 of the trustee's Post-Trial Brief related to Trojan and
Trojan/Ulta is incorrect.

could perfect the lien under state law at the time payment is made, and the perfection of the lien is not avoidable under the Bankruptcy Code, then the payments are not recoverable").

It makes no difference that the subcontractor – not an owner or general contractor – is the debtor because, again, the trustee stands in the shoes of Living Water with respect to its interest in the accounts receivable. *See In re Romagnoli*, 631 B.R. at 814. For example, in *Matter of Bailey*, 17 B.R. 50 (Bankr. W.D. Ark. 1981), a trustee sought to recover an alleged preference against a defendant materialman in a plumbing subcontractor's bankruptcy. The subcontractor was indebted to the defendant for materials but advised an officer of the defendant that he was filing for bankruptcy. The officer then took steps to recover from the contractor – including obtaining a check from the contractor to be endorsed by the subcontractor – but the contractor would not pay "until it was presented with the defendant's written release of [a] mechanic's lien on the materials provided by the defendant and installed by the debtor." *See id.*, at 51. The bankruptcy court ruled for the materialman on the trustee's preference action because the payment from the general contractor to the materialman was "[i]n substance . . . simply a payment on account of the materials which was owed on account of the materialman's lien of the defendant." The court explained:

> . . . The debtor [in endorsing the check] simply acted as a conduit for the payment, which, under the circumstances detailed above, must be regarded as paid only on account of the lien and for the express purpose of dissolving it. In determining whether a transfer has been a preference, a bankruptcy court must look through form to substance, and treat the transaction according to its real nature. The court, in so ruling, is mindful of the debtor's testimony that the check was issued to him as payee and that he regarded himself as holding it in his own right in the short period of time which elapsed between its being handed to him and his endorsing it over to the defendant. But this testimony cannot be viewed in isolation from the intention objectively manifested by all the parties to the transaction to the effect that the payment would not have been made except for the purpose of application against the bill for materials owed to the defendant. And the bill which was owed by [the subcontractor debtor] to the defendant was

the same as the bill paid by [the general contractor] to [the subcontractor debtor] on account of the materials against which the lien would otherwise have applied.

Even if the bankruptcy estate could be said to be entitled to recover the money thus paid, the demands of equity and justice would require that the same money should be regarded as the proceeds of the material against which the defendant's lien was initially asserted and therefore payable to defendant from the estate in satisfaction of the lien. Therefore, the defendant has not, by virtue of receiving the challenged payment, received more than it would have been entitled to receive in distribution under Chapter 7 of the Bankruptcy Code.

*Id.*, at 52 (internal citations, quotation marks, and parentheses omitted).

The same analysis applies here. The trustee correctly points out that the Alabama unpaid balance lien is on the unpaid balance due the contractor from the owner, not due the subcontractor from the contractor. (*See* Pl.'s Post-Trial Brief, doc. 126, at pp. 29-30). But had Winsupply not been paid and had it moved forward with enforcement of its unpaid balance lien "any unpaid balance in the hands of the owner" would be subject to the lien under Alabama Code § 35-11-218. And like in *Matter of Bailey*, the Alabama general contractors and owners would not have paid the debtor Living Water prepetition – or the chapter 7 trustee postpetition – without first obtaining lien releases, which lien releases could not have come without assurance that Winsupply would be paid.

Finally, the fact that two entities – Encompass Health and York-Brawley (*see* Karin Garvin Test., Tr., at 64:22-16; Pl.'s ex. 29) paid the trustee is inapposite. There was no evidence that either of those creditors owed any money to materialman.[5]

_____

[5] This analysis applies equally to all projects, whether in Alabama or Florida.

(b) The Florida projects (Seasound, Town Center, Watercraft, and Tyndall)

- Seasound and Town Center (private projects)

For private (non-government) projects, under Florida Statute § 713.06, "[a] materialman . . . has a lien on the real property improved for any money that is owned to [it] for . . . materials furnished . . . ."  The "fundamental purpose of [this law] is to protect those who have provided . . . materials for the improvement of real property." *See WMS Constr., Inc. v. Palm Springs Miles Assocs., Ltd.*, 762 So. 2d 973, 974-75 (Fla. Dist. Ct. App. 2000); *see also* Fla. Stat. § 713.02.  It must be "construed favorably so as to give . . . suppliers the greatest protection compatible with justice and equity." *See WMS Constr.*, 762 So. 2d at 975; *Trump Endeavor 12 LLC v. Fernich, Inc.*, 216 So. 3d 704, 708 (Fla. Dist. Ct. App. 2017).  The law "'was enacted to protect the interests of subcontractors and materialmen who remain unpaid while the owner pays the contractor directly.'" *See Trump Endeavor*, 216 So. 3d at 708 (citation omitted).

Under Florida Statute § 713.06(2)(a), to perfect the lien, a materialman must serve a notice on the owner and a notice on the general contractor within "45 days after commencing . . . to furnish . . . materials." *See Lehmann Dev. Corp. v. Nirenblatt*, 629 So. 2d 1098, 1099 (Fla. Dist. Ct. App. 1994).  Failure to serve or timely serve these notices "is a complete defense to enforcement of a lien . . . ." *See* Fla. Statute § 713.06(2)(a).

But if the notice is timely served, "when any payment becomes due to the contractor on the direct contract, except the final payment, the owner *must* pay or cause to be paid . . . the sum then due to each lienor giving notice prior to the time of the payment." *See* 36 Fla. Jur. 2d Mechanics Liens § 105 (citing Fla. Stat. § 713.06(3)(c)(1)) (emphasis added).  Payment can come from the general contractor or directly from an owner (*i.e.*, an owner may pay subcontractors and materialmen directly, it does not have to pay a general contractor first). *See,*

*e.g.*, *In re MiScott Corp.*, 49 B.R. 893, 896 (Bankr. S.D. Fla. 1985). Final payments (which are not at issue here) have different requirements, but those requirements include an assurance by the general contractor to the owner that the materialmen have been paid. *See* 36 FLA. JUR. 2D MECHANICS LIENS § 103.

The analysis on the two Florida private projects is therefore similar to the analysis on the Alabama projects. If the notice was timely given (more on that below), Winsupply would have had perfected liens on the Seasound and Town Center real property and the Florida general contractors and owners on those projects could have withheld any amounts owed Living Water from the trustee without assurance that Winsupply would be paid and the subject liens released.

Recognizing this, the trustee contends that Winsupply did not prove that it gave notice within 45 days to perfect a lien because the testimony of Winsupply's accounts receivable employee Ms. Faulkner and Winsupply's president Mr. Cimino about notice is not credible or reliable. For example, she argues that the court should not trust these witnesses because they did not prepare, review, sign, or mail the notices. But the court finds that neither of these witnesses would prepare, review, sign, or mail notices to owners and contractors because there was ample and undisputed evidence that Winsupply used a third party to send the notices – at the latest – within a few days of receiving a job.

While it would have been better if Winsupply had offered the notices themselves into evidence,[6] the court does not find that the failure to do so dooms Winsupply's case. The court believes that testimony of Ms. Faulkner and Mr. Cimino and finds that timely notice was given on the Seasound and Town Center projects (and on the other five projects, as well), that

---

[6] In response to a question from the court, Winsupply's counsel stated that he "didn't know that they were in dispute, so we didn't use them as exhibits. . . . [W]e did not list them as exhibits because it wasn't really something that was in controversy." (*See* Tr., at 131:16-132:6).

Winsupply had perfected liens at the time the payments were made on the Seasound and Town Center projects, and that Winsupply would have still had those liens once the bankruptcy was filed. *See In re Wagner*, 115 F.4th 1296, 1303 (11th Cir. 2024) (bankruptcy court's "findings of fact that are based on determinations regarding the credibility of witnesses at a bench trial" are accorded "substantial deference") (citation and quotation marks omitted); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 623 (1993). Winsupply thus did not receive more on the Seasound and Town Center projects than if the payments had not been made before Living Water filed for bankruptcy and the trustee had demanded payment from the Seasound and Town Center general contractors and owners.

Finally, although Florida Statute § 713.08 requires that the materialman record a claim of lien within 90 days of "the final furnishing of . . . materials by the lienor[,]" that deadline had not yet expired when the payments on the Seasound and Town Center projects were made. Even so, the court finds that Winsupply timely recorded claims of lien on both projects.

- Watercraft and Tyndall (government projects)

For government projects, Florida Statute § 255.05 "substitute[s] a bond . . . in lieu of lien rights." *See State of Fla. for Use & Benefit of Westinghouse Elec. Supply Co. v. Wesley Constr. Co.*, 316 F. Supp. 490, 498 n.1 (S.D. Fla. 1970). It requires a bond by any entity that contracts "with the state or its subdivisions for work on a public project . . . ." *See Aquatic Plant Mgmt., Inc. v. Paramount Eng'g, Inc.*, 977 So. 2d 600, 603 (Fla. Dist. Ct. App. 2007). Similar to Florida Statute § 713.06, § 255.05 requires a 45-day notice to contractor as a "condition precedent to the maintenance of an action" by a materialman against the bond. *See D.I.C. Com. Constr. Corp. v. Knight Erection & Fabrication, Inc.*, 547 So. 2d 977, 979 (Fla. Dist. Ct. App. 1989); *Sharpe, Inc. v. Neil Spear, Inc.*, 611 So. 2d 66, 67-68 (Fla. Dist. Ct. App. 1992). Florida Statute § 255.05 also

16

requires a 90-day notice of nonpayment to the contractor and surety – which must be in substantially the same form as set forth in the statute – "after the final furnishing of . . . materials . . . ."  "Compliance with the notice provisions is" required to recover "under the bond."  *See Glaze Supply Co. v. Canyon Power Sols., LLC*, No. 6:21-CV-1841-ACC-DAB, 2022 WL 18492542, at *4 (M.D. Fla. Oct. 5, 2022); *see also Sharpe  v. Neil Spear*, 611 So. 2d at 67-68.  If the notices are not given, no action may "be instituted against the contractor or the surety . . . ." *See* Fla. Stat. § 255.05.

The trustee argues that Winsupply did not give the 45-day notice to contractor and 90-day notice of nonpayment and would not have been able to recover under the bonds on the Watercraft and Tyndall projects.  The court has already determined that the 45-day notice was given on all projects but agrees with the trustee in part on the 90-day notice required for the Watercraft and Tyndall projects.

Winsupply states without citation to evidence that it "noticed the bonding company (surety) for the two government projects."  (*See* Def.'s Post-Trial Brief, doc. 125, at p.21).  No copy of any notice of nonpayment is in evidence, and the scant testimony on these notices (as opposed to the initial notices) is unspecific.  But based on the dates of the invoices, the email correspondence in the record, and the testimony of Ms. Faulkner, the court concludes that timely notices of nonpayment were sent on the Watercraft project.  (*See, e.g.*, Pl.'s exs. 4, 14; Faulkner Test., Tr., at 86:22-88:18).  Winsupply thus could have recovered under the bond even after Living Water filed for bankruptcy protection.  As with the private construction jobs, the trustee has not shown that Winsupply would have received more than it would have otherwise on the Watercraft project.

The same is not true for the Tyndall project.  The final invoice date is March 9, 2021, the only mention of any notice of nonpayment is in an email to a general contractor dated Tuesday, June 8, 2021 (91 days after the final invoice date), and there is no evidence of a notice of nonpayment to the surety.  (*See* Pl.'s exs. 4, 9).  Given the skimpy evidence on this issue, the court will not infer or assume that the notices of nonpayment were timely given.  For the Tyndall project, the court finds that the trustee has established that Winsupply received more than it would have received because the general contractor was not obligated to pay Winsupply to avoid a claim on the bond.  The trustee is thus entitled to recover the $10,441.78 direct payment from the general contractor to Winsupply on that project.

(2) Property of the estate

"A preferential transfer occurs only if the debtor has an interest in the property transferred."  *In re Grabill Corp.*, 135 B.R. 101, 1018 (Bankr. N.D. Ill. 1991).  The Code does not define the term "interest of the debtor in property," as used in § 547(b).  *See id.*  But this term is "best understood as property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."  *See Begier v. I.R.S.*, 496 U.S. 53, 58 (1990).  Courts look to Code § 541 for what is part of the estate.  *See id.*, at 58-59.

The scope of § 541 is broad.  *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983); *see also In re Holywell Corp.*, 913 F.2d 873, 881 (11th Cir. 1990) ("Section 541 is construed broadly, so as to effectuate Congressional intent that a wide range of property be included in the estate.").  It defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the case" and "wherever located and by whomever held . . . ."  Under this broad definition, the court finds that the accounts

receivable owed to Living Water on the seven projects would have been part of the estate – albeit

subject to the liquidation test above (*i.e.*, the trustee still would have had to pay Winsupply even

if the accounts receivable had come into the estate).  *See, e.g.*, *In re Climate Control Mech.*

*Servs., Inc.*, 570 B.R. 673, 676-77 (Bankr. M.D. Fla. 2017).

Winsupply generally relies on *T & B Scottsdale Contractors, Inc. v. United States*, 866

F.2d 1372 (11th Cir. 1989) to argue that the accounts receivable never became property of

Living Water's bankruptcy estate and never would have been property of the estate.  In *T & B*, a

general contractor and the debtor subcontractor had a joint account and a contract that "expressly

stated the funds [in the account] were to be used to pay the materialmen."  *See id.*, at 1376.  It

was "undisputed that the parties agreed that the funds were meant solely for the materialmen."

*See id.*  In that very specific circumstance, the court found that funds in the account did not

belong to the bankruptcy estate and that "[t]he district court erred in holding that the funds

belonged in the estate merely because they had been located in an account bearing [the debtor

subcontractor]'s name."  *See id.*  Here, there was no evidence of a joint account between any

general contractor and the debtor subcontractor Living Water or of a similar agreement

governing such a joint account.[7]  *See In re Spancrete of Fla., LLC*, 344 B.R. 164, 167-68 (Bankr.

M.D. Fla. 2005).

---

[7] Winsupply was hampered in its defense because Living Water could not produce any of its
contracts with the general contractors on the seven projects because its office manager had
absconded with its records.  The only contract Winsupply obtained via subpoena was a
Subcontractor Agreement (Def.'s exhibit 4E) between Berry Construction Company and Living
Water related to Trojan Town Center in Alabama.  The court agrees with the trustee that if this
contract applies at all, it applies to the payment made on the Trojan project only, not Trojan/Ulta,
as the payment related to Trojan/Ulta came from another contractor.  And while the court need
not reach this issue because it has already found that the payment made on the Trojan project
was not preferential, the court disagrees with Winsupply – based on the Code's broad definition
of "property of the estate" – that under this contract, the payment on the Trojan project would
have been held in trust by Living Water if the payment had been made to Living Water and not
directly to Winsupply.

For the government jobs, Winsupply cites *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132 (1962) to argue that the payments one those jobs are not property of the estate under the doctrine of equitable subrogation.  (*See* Def.'s Post-Trial Brief, doc. 125, at pp.6-7).  *Pearlman* involved a surety's subrogation rights after it paid the claims of materialmen, and was decided before the "enactment of the Bankruptcy Code [which] expanded the definition of property of the estate."  *See In re Climate Control Mech. Servs.*, 570 B.R. at 677.  Even so, in *In re Cone Constructors, Inc.*, 265 B.R. 302 (Bank. M.D. Fla. 2001), applying *Pearlman*, the surety paid on claims made on its bond under Florida Statute § 255.05, implying that the subcontractors there had complied with the statute.  Under Florida case law, any rights (under an equitable subrogation theory or otherwise) a surety would have had in payments made to Winsupply on a payment bond would have been entitled to priority only on claims the surety "properly paid pursuant to the payment bond[,]" which requires notices of nonpayment under Florida Statute § 255.05.  *See, e.g.*, *Sch. Bd. of Broward Cnty. v. J.V. Constr. Corp.*, No. 03-60005-CIV-MOR/GAR, 2004 WL 1304058, at *19-20 (S.D. Fla. Apr. 23, 2004) (surety only entitled to priority on those funds for which it submitted proof of a filing of notice of nonpayment by the subcontractors); *see also Pinewood Plumbing Supply, Inc. v. Centennial Constr., Inc.*, 489 So. 2d 216, 217 (Fla. Dist. Ct. App. 1986) ("Section 255.05 provides for an adequate remedy at law.  [A materialman]'s failure to comply with the notice requirements does not make the remedy inadequate.  Thus [the materialman] was not entitled to equitable relief.").

Winsupply also argues that the accounts receivable are not property of the estate under the earmarking doctrine, trust theories, and because some of the project payments (Watercraft, South Baldwin, and Trojan/Ulta) were made by joint check.  While some courts recognize "an exception to section 547(b) when the property is 'earmarked[,]'" the Eleventh Circuit has

declined to apply the earmarking doctrine in the context of preference actions, and this court declines to do so. *See In re Egidi*, 571 F.3d 1156, 1162 (11th Cir. 2009); *see also In re ATM Fin. Servs., LLC*, No. 6:08-BK-969-KSJ, 2011 WL 2580763, at *7 (Bankr. M.D. Fla. June 24, 2011) (the Eleventh Circuit "has not adopted the earmarking doctrine in any context and there is scant support for it in reported bankruptcy court decisions within this circuit"); *In re WB Servs., LLC*, 587 B.R. 548, 556 (Bankr. D. Kan. 2018) (earmarking doctrine should be "narrowly construed"); *In re Cox & Schepp, Inc.*, 523 B.R. 511, 518 (Bankr. W.D.N.C. 2014).

Similarly, the court is unpersuaded by the cases Winsupply cites for its arguments based on various trust theories and finds that no constructive or other trust existed under Alabama or Florida law that would take the accounts receivables out of the estate. *See In re Witko*, 374 F.3d 1040, 1043 (11th Cir. 2004) (property interests determined by state law). For this reason, pertaining to the Tyndall project, the earmarking doctrine and various trust theories also do not supplant the specific state statute requiring Winsupply to send a timely notice of nonpayment to obtain bond rights. *See Pinewood*, 489 So. 2d at 217.

For the joint check payments, there is case law from at least one bankruptcy court within the Eleventh Circuit supporting Winsupply's position. *See In re Winsco Builders, Inc.*, 156 B.R 98, 100-01 (Bankr. M.D. Fla. 1993). While the court in that case discussed the joint checks in terms of "earmarked funds," this court considers the issue of joint checks to be separate from the earmarking doctrine. At any rate, this court is of the opinion that the better analysis is that the accounts receivable would have been property of the estate but still subject to Florida and Alabama's construction lien laws requiring the trustee – standing into the shoes of Living Water – to pay Winsupply. *See In re Witko*, 374 F.3d at 1042-43 (estate is construed broadly, but trustee takes no greater rights than debtor itself has). Put another way, while the money owed by

21

Watercraft, South Baldwin, and Trojan/Ulta to Living Water (whether paid by joint check or not) would have become property of the estate, the trustee still would have had to pay Winsupply and Winsupply did not receive more than it would have received otherwise.

(3) Ordinary course defense

The Code does not define "ordinary course of business" under § 547(c)(2)(A) or "ordinary business terms" under § 547(c)(2)(B). *See In re Globe Mfg. Corp.*, 567 F.3d 1291, 1298 (11th Cir. 2009). "Courts have interpreted the 'ordinary course of business' requirement to be subjective in nature insofar as it requires courts to consider whether the transfer was ordinary in relation to the other business dealings between *that* creditor and *that* debtor." *Id.* (citation and quotation marks omitted). "The 'ordinary business terms' requirement, by contrast, is objective in nature, requiring proof that the payment is ordinary in relation to prevailing industry standards." *Id.* Winsupply has the burden of proof on the defense. *See* 11 U.S.C. § 547(g).

Winsupply appears to have abandoned any argument that the transfers were made in the ordinary course of business between Living Water and Winsupply. (*See* Def.'s Post-Trial Brief, doc. 125, at pp. 21-22). Still, the court finds that Winsupply did not meet its burden under § 547(c)(2)(A) because the evidence (*see, e.g.*, Pl.'s exs. 8-15) shows that Winsupply, through its accounts receivable employee, undertook aggressive collection action – that it had never taken before with Living Water – once it learned that Total Fire was taking over Winsupply. *See, e.g.*, *In re JSL Chem. Corp.*, 424 B.R. 573, 581-82 (Bankr. S.D. Fla. 2010).

Instead, Winsupply states that just because its "collection efforts were extraordinary as it pertains to the parties' business [does] not mean that Winsupply's collection efforts were extraordinary under industry standards." (*See* Def.'s Post-Trial Brief, doc. 125, at p.22)

22

(emphasis omitted).  It contends that its collection activity in "exercis[ing] its statutory materialmen lien rights against [Living Water]'s projects . . . is commonplace and standard in the materialmen construction industry . . . ."  (*See id.*).

Mr. Cimino testified that Winsupply often exercised its liens rights and that Winsupply's "collection procedures . . . are . . . commonplace for vendors throughout the construction industry . . . ."  (*See* Cimino Test., Tr., at 128:25-129:8).  While Winsupply's general collection procedures – including recording claims of lien – may have been ordinary under industry standards, the problem is that there was no evidence that the speed and manner at which Winsupply went about collecting when it was informed about Total Fire is ordinary under those standards.  For example, on one of the projects (Town Center), Winsupply recorded a claim of lien only 20 days after sending an invoice.  (*See* Pl.'s exs. 4, 7).  Having considered all of the evidence, the court finds that Winsupply has not met its burden under § 547(c)(2)(B), either.[8]

<u>Conclusion</u>

To the extent the court has not specifically addressed any of the parties' arguments or evidence, it has considered them and determined that they would not alter this result.  For the reasons discussed above, the court finds in favor of Winsupply except on the Tyndall project, for which the court finds that the payment in the amount of $10,441.78 is avoided as a preferential transfer under Bankruptcy Code § 547(b).  The court will enter a separate judgment ordering Winsupply to turn over said amount to the trustee within 14 days of the entry of this order.  The

---

[8] The court would have ruled the same even if it had considered the expert's testimony.

court declines to award prejudgment interest.  *See In re Globe Mfg.*, 567 F.3d at 1300-01; *In re JSL Chem.*, 424 B.R. at 583.

Dated:  October 3, 2025

_____
HENRY A. CALLAWAY
U.S. BANKRUPTCY JUDGE